RICHARD L. HOLMES, Retired Appellate Judge.
Mary Jones appeals from a summary judgment entered in favor of John Robert Dudley and Joey Massingill. This case is before this court pursuant to Ala.Code 1975, § 12-2-7(6).
In January 1996 Jones filed a two-count complaint, pursuant to Ala.Code 1975, §§ 25-1-1 and 25-5-11, against Dudley Lumber Company, Inc. (employer), Dudley, and other fictitious parties. Thereafter, Jones amended the complaint to substitute Massingill as a defendant. We would note that the employer was dismissed from this case, and the case proceeded against Dudley and Massingill.
Jones is the custodian for Mary Buchanan, who is the sister of Odis W. Buchanan (employee). On or about March 1, 1995, the employee was fatally injured while working in the line and scope of his employment with the employer.
The employer is a company that manufactures lumber, and Dudley is the president of the company. Massingill, the general superintendent and Dudley’s son-in-law, oversees the operation of the entire plant, which consists of a sawmill, a planing mill, and a boiler and dry kiln complex.
*759 Dudley and Massingill filed a motion for a summary judgment, along with a brief and documentation in support of their motion. Jones filed a response and documentation in opposition to the summary judgment motion.
After a hearing the trial court issued an order, finding that there existed no genuine issue of a material fact and that Dudley and Massingill were entitled to a judgment as a matter of law.
On appeal Jones contends that the trial court committed reversible error when it entered a summary judgment in favor of Dudley and Massingill.
Initially, we would note that Rule 56(c), Ala. R. Civ. P., provides that a summary judgment is appropriate in situations where no genuine issue of any material fact exists and the movant is entitled to a judgment as a matter of law. It is well settled that the moving party has the burden of establishing that no genuine issue of a material fact exists and that all reasonable uncertainties regarding the existence of a genuine issue of a material fact must be resolved against the moving party. Porter v. Fisher, 636 So.2d 682 (Ala.Civ.App.1994).
Once the movant makes a prima facie showing that no genuine issue of a material fact exists, then the burden shifts to the non-moving party to present substantial evidence regarding the existence of a genuine issue of a material fact. Porter, 636 So.2d 682.
The applicable standard of review is “substantial evidence.” See Ala.Code 1975, § 12-21-12. In West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989), our supreme court stated the following: “[S]ub-stantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
Ala.Code 1975, § 25-1-1(a), provides the following:
“Every employer shall furnish employment which shall be reasonably safe for the employees engaged therein and shall furnish and use safety devices and safeguards and shall adopt and use methods and processes reasonably adequate to render such employment and the places where the employment is performed reasonably safe for his employees and others who are not trespassers, and he shall do everything reasonably necessary to protect the life, health and safety of his employees and others who are not trespassers.”
In Powell v. United States Fidelity & Guaranty Co., 646 So.2d 637, 639-40 (Ala.1994), our supreme court “reaffirmed] the principle that an injured employee may maintain an action under § 25-1-1 against a co-employee for failure to maintain a safe workplace, if the failure was willful and intentional.” (Emphasis added.)
We would note that our supreme court stated the following in Bean v. Craig, 557 So.2d 1249, 1252 (Ala.1990):
“Despite the fact that Craig was aware of a risk in operating the lift, this evidence tends to prove only negligent, and not willful, conduct. The legislature, in recognizing the difference between negligent and willful actions, sought to ensure that cases of this type would not be submitted to a jury without some evidence showing either: (1) the reason why the co-employee would want to intentionally injure the plaintiff, or someone else, or (2) that a reasonable person in the position of the defendant would have known that a particular result [ (i.e., injury or death) ] was substantially certain to follow from his actions. An employee may be liable for injuries sustained by a' fellow employee only when such injury is caused by the offending employee’s willful conduct. ...
[[Image here]]
“A plaintiff suing a co-employee must show facts tending to prove that the co-employee set out purposefully, intentionally, or by design to injure someone; a showing of mere negligence is not enough. Evidence showing only a knowledge or an appreciation of a risk of injury will not entitle a plaintiff to a jury determination of whether the co-employee acted with a purpose, intent, or design to injure another. A co-employee must either have actual knowledge that an injury will occur *760 from his actions or have substantial certainty that injury will occur.”
(Citations omitted) (emphasis added).
Ala.Code 1975, § 25-5-11, provides thé following, in pertinent part:
“(a) If the injury 'or death for which compensation is payable under Articles 3 or 4 of this chapter was caused under circumstances also creating a legal liability for damages on the part of any party other than the employer ..., the employee, or his or her dependents in case of death, may proceed against the employer to recover compensation under this chapter ..., and at the same time, may bring an action against the other party to recover damages for the injury or death, and the amount of the damages shall be ascér-tained and determined without regard to this chapter. If a party, other than the employer, ... is an officer, director, agent, or employee of the same employer ..., the injured employee, or his or her dependents in the ease of death, may bring an action against any ... .person ... only for willful conduct which results in or proximately causes the injury or death....
[[Image here]]
“(c) As used herein, ‘willful conduct’ means any of the following:
. “(1) A purpose or intent or design to injure another; and if a person, with knowledge of the danger or peril to another, consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he or she is guilty of ‘willful conduct.’ ”
(Emphasis added.)
In Padgett v. Neptune Water Meter Co., 585 So.2d 900, 901 (Ala.1991), our supreme court stated, “Section 25-5-11(a) provides that actions may be maintained against those parties that may be jointly liable with the employer, provided that if the other party is a coemployee, then his actions, in order to give rise to liability, must be willful.” (Emphasis added.)
The question which this court must answer is whether Jones presented substantial evidence of “willful conduct” on the part of Dudley and Massingill.
Our review of the record reveals the following pertinent facts: In 1981 Dudley added the boiler and dry kiln complex to the plant to dry the lumber. Dudley purchased a new kiln, and he purchased a used boiler at an auction. Dudley hired an individual to install this equipment. During this period of time a shavings bin/fuel storage house (a building approximately 20 feet wide, 60 feet long, and 20 feet high) was designed and constructed to store the shavings to keep them dry and to use them as fuel for the boiler.
The sawmill operated from 6:30 a.m. to 4:15 p.m. Walter Finley, another employee, worked the second shift (3 p.m. to 11 p.m.) as the boiler and kiln operator. The employee worked the third shift (11 p.m. to 6:30 or 7 a.m.) as the boiler and kiln operator. The employee was the only employee on duty at the plant during the third shift.
The employee had worked in this position with the employer for approximately two and one-half years prior to this accident. Mas-singill was the employee’s direct supervisor, and Dudley was Massingill’s direct supervisor.
The employee’s duties were as follows: To ensure that the shavings continued to feed to the boiler, to check the kiln to ensure that it was working properly, and to act as the night watchman for the mill.
The shavings bin/fuel storage house contained conveyors which brought the shavings into the enclosure and carried the shavings out of the enclosure into the boiler. Massin-gill testified that these piles of shavings usually formed on each side of the conveyor and that these shavings piles could be as high as seven to fifteen feet on each side of the conveyor.
Massingill also testified that the shavings would stop flowing onto the conveyor carrying the shavings into the boiler because the shavings would be “bridged out.” When this occurred, the boiler and kiln operator had to enter the shavings bin/fuel storage house, had to climb down the ladder from the catwalk, and had to use a rake to dislodge the shavings from the wall onto the conveyor.
*761 On March 1, 1995, Massingill arrived at the plant at approximately 6 a.m. When Massingill arrived, he found that the shavings were not feeding into the boiler; therefore, he entered the shavings bin/fuel storage house, climbed down the ladder, and raked the shavings onto the conveyor. We would note that Dudley testified that when Massin-gill was in the shavings bin/fuel storage house at 6:00 a.m., there was no sign of the employee because “[i]t was just filled in just like it was normally. See, when it caves, it just covers that over and slides this way again, see, and you’d have no idea that anything had happened.”
Thereafter, Massingill looked for the employee, but was unable to locate him. Mas-singill testified that he went to the employee’s house and even contacted the employee’s friends and relatives in an attempt to locate him.
Dudley testified that around 3 p.m. that afternoon, he went to the boiler complex to question Walter Finley about the employee’s whereabouts and that Finley showed Dudley the employee’s hat, his cigarettes, and his cigarette lighter. Dudley stated that when he saw the hat and the cigarettes, he “knew then where [the employee] was.”
Thereafter, the process of clearing the shavings bin/fuel storage house began in an attempt to locate the employee’s body. The employee’s body was discovered in the shavings bin/fuel storage house at approximately 1 a.m. on March 2, 1995, and the body was finally extracted from the shavings around 9 or 10 a.m. on March 2,1995.,
The autopsy revealed that the employee “aspirated wood chips” and died as a result of “a combination of traumatic and aspiration asphyxia.” Because no one was present when the accident occurred, no one knows exactly how the accident occurred.
Following the accident, Dudley notified the Occupational Safety & Health Administration (OSHA). OSHA began its investigation on March 2, 1995. Thereafter, OSHA issued a report, which was filed with the trial court in response to the summary judgment motion. The OSHA report stated the following, in pertinent part:
“The victim was found erect surrounded by shavings. From the position of the body, it appears that the victim had walked into the center of the room, over the chain, and by using a short pipe/probe, apparently tried to scoop some shavings over the chain. When he did that, apparently he sunk since he was standing over the chain on the bottom of the floor, and also, the mountains of shavings came down, engulfing him, and eventually suffocating him.”
Jones contends that the shavings bin/fuel storage house, which was designed, constructed, and maintained by Dudley and his agents, created a known dangerous and unsafe condition. Jones further contends that this known dangerous and unsafe condition, combined with the unsafe practices mandated by Dudley and Massingill, created a substantial certainty of injury or death to the employee.
We would note that Dudley testified in his deposition that he and Massingill were responsible for maintaining a safe workplace for the employees. However, it is Dudley and Massingffl’s contention that they maintained a safe workplace and that no danger existed if the employee had raked the shavings down as he had been instructed.
We would note that the OSHA report also stated the following, in pertinent part:
“An employee has to go inside the fuel house every 2 hours and, using a pitchfork, the employee walks along the sides of the fuel house walls pitching the shavings to the center of the room where the bottom chain [which carries the shavings into the boiler] is. The employee has to walk along one side of the fuel house, apr. 70 feet, then come back on the other side of the wall, another 70 feet.
“The company president, [Dudley], told me that all the employees working in the fuel house have been told to never walk into the center of the fuel house, i.e., don’t walk over the bottom chain because the shavings have a tendency to tunnel out over this chain and if one was to step over that area then he could sink [ or more feet, depending on the amount of shavings inside the fuel house. (Based on this statement from [Dudley] it appears that *762 the employer had knowledge and had also recognized that a potential engulfment hazard existed.) I interviewed all the employees that work in the fuel house and they all told me that they had been told never to walk in the center of the room over the bottom chain. No procedures were in writing, only verbal training.”
(Emphasis added.) The OSHA report also stated the following, in pertinent part:
“23. Employer Knowledge: [Dudley] told CSHO that he told all the employees that worked in the fuel house not to walk to the center of the room because the shavings could create a tunnel over the chain and they could get sucked in. A photo taken by the Sheriffs dept, shows that tunneling effect. The employer had recognized that there was an engulfment hazard associated with entering the fuel house.
“24. Comments (Employer, Employee, Closing Conference): When I arrived at the plant and looked inside this fuel house, I asked [Dudley] what steps they had taken to prevent this accident from happening again and killing someone else. I was told that they did not know what else to do different, they had been doing this ‘walking the shavings’ for 15 years and never had an accident, and that they reminded all the employees to be careful and not to step towards the center of the room. After examining this situation again, I suggested that they, immediately initiate a 2-man buddy system. One man ‘walking the shavings’ while another man was watching the first man. Also, the man that was doing the ‘walking’ would be tiéd off through a full body harness and a lanyard short in length to the guardrail of the walkway that is inside the fuel house.”
(Emphasis added.)
It is axiomatic that there is a certain degree of risk associated with certain jobs. In the instant ease it is undisputed that Dudley and Massingill had knowledge of the engulfment hazard associated with entering the fuel house. ' The evidence also reveals that all the kiln operators, including the employee, had knowledge of the engulfment hazard associated with entering the fuel house.
The testimony reveals that both Massingill and Walter Finley, another boiler and kiln operator,, trained the employee how to perform his job properly. According to Dudley, all employees had been warned never to walk into the center of the fuel house over the bottom chain. In the instant case the employee apparently failed to heed this warning. As noted previously, the employee had been working for the company for two and one-halfyears.
We reiterate that “[e]videnee showing only knowledge and appreciation of the risk of injury or death, short of a substantial certainty that injury or death would occur, is insufficient for the purpose of showing willful conduct.” Lee v. Longhorn Steaks of Alabama Inc., 662 So.2d 672, 676 (Ala.1995).
In the instant case the OSHA investigator interviewed Dudley after the accident and asked him what steps had been taken to prevent future accidents. Dudley stated that he did not know what could be done differently because, he said, the company had been performing this “walking the ■ shavings” for 15 years and had never had an accident. As noted previously, after the accident, OSHA recommended that a “2-man buddy system” be implemented.
Although the evidence in the instant case tends to show that Dudley and Massingill may have acted negligently, or perhaps wantonly, in not implementing a more safe procedure for entering the fuel house and “walking the shavings,” such evidence failed to show that Dudley and Massingill set out to purposely, intentionally, or by design, injure anyone. Furthermore, even though Dudley and Massingill knew of the engulfment hazard, they still did not have the requisite knowledge i.e., they did not know to “a substantial certainty that injury or death would occur.” In other words, the evidence failed to establish willfulness.
In light of the foregoing, Jones failed to present any substantial evidence regarding the existence of a genuine issue of a material fact. Porter, 636 So.2d 682.
*763 Consequently, the trial court properly entered the summary judgment in favor of Dudley and Massingill.
The foregoing opinion was prepared by Retired Appellate Judge RICHARD L. HOLMES while serving on active duty status as a judge of this court under the provisions of Ala.Code 1975, § 12-18-10(e).
AFFIRMED.
All the Judges concur.